## HEARD v. THE STATE.

1. Under the code, §4578, it is no justification for the running of a freight-train on Sunday that the company has issued general rules and orders to its employees not to do so, without also showing either directly or by circumstances, such as calling upon employees to account for their misconduct, that in the particular instance the rules or orders were violated without the sanction or connivance of the officer indicted, that officer being one of those whose duty it was to control the running of the train in question.
2. The evidence warranted the verdict.　　*Judgment affirmed.*
   July 3, 1893.

Indictment for misdemeanor.　Before Judge MILNER. Whitfield superior court.　April term, 1893.

The defendant, who was the train dispatcher of the Western & Atlantic Railroad Company, was indicted at the April term, 1891, for running a freight-train on Sunday, the 22d of March, 1891.　After verdict of guilty, defendant moved for a new trial on the general grounds. The motion was overruled.　There was testimony for the State, that two freight-trains were run over the Western & Atlantic railroad on separate Sundays between February and April, 1891, one between eight and nine o'clock and the other between nine and eleven in the morning, both going north.　It was admitted that the defendant had these trains in charge.

Defendant introduced the assistant superintendent of the railroad company, who testified as follows: On the evening before the day charged in the indictment, a wild train was started from Atlanta to Chattanooga, leaving Atlanta at twelve fifty.　It was directed to take a siding at Smyrna to allow a south-bound freight-train to pass.　This train, if it had been run on through to Chattanooga, would have arrived there about ten o'clock Saturday night.　Before it got into the switch at Smyrna, it was run into by the south-bound freight-train, and a serious wreck was the consequence.　As soon as we

heard of the wreck in Atlanta, I and others went to the place of the wreck and went to work clearing the same away, which we did not get effected till about nine o'clock Saturday night, when we got the main track clear. The next regular freight-train, after the wreck, was scheduled to leave at about seven fifty P. M. from Atlanta. They did not get away from Atlanta, on account of the wreck, till about nine eighteen. Their schedule time to reach Chattanooga was about six thirty-five in the morning. They left Atlanta at about nine eighteen, and I see, by the record kept by the train dispatcher, that they left Marietta at one eighteen A. M. Sunday; why they were so delayed I can only infer by the fact known to me that there was a great block of trains there, going both ways, caused by the wreck of the first train. These trains passed through Dalton a little before eight o'clock Sunday morning. They reached Ringgold at eight fifteen. The wrecked train followed them, and never passed through Dalton till after ten o'clock. These trains, but for the wreck, would have arrived at Chattanooga before seven o'clock Sunday morning. These schedules are made to give the trains plenty of time, and in an emergency they can run much faster than their schedule time. Unless delayed somewhere, they could easily have gotten to Chattanooga before seven o'clock Sunday morning. Indeed, if there had been no obstruction in the way, they could have left Marietta at one eighteen A. M., and got to Chattanooga before eight. We send out now a train with perishable freight, which leaves Atlanta at nine thirty-five Saturday night and reaches Chattanooga on schedule time next Sunday morning before seven o'clock. If any other train ever was run on Sunday before the finding of this indictment, we had no notice of it. Orders were given to all freight-train conductors not to run their trains on Sunday. This was posted on a bulletin-board at Atlanta,

and all conductors' attention was called to it. In Tennessee freight-trains are allowed to run on Sunday, and being forbidden to run in Georgia, freight accumulates on us in Chattanooga on Sunday, and hence causes a schedule on Monday to have more sections on it than ordinarily runs. To prevent too much crowding, some of them are directed to leave before schedule time, but are given strict orders not to come into Georgia until after midnight. Once after this a report came to us that trains had run into Georgia before midnight, and the men were notified that if it happened again they would be dealt with; and if ever any trains were run on Sunday except in case of accident, it was done in violation of the orders of the company. I was not on duty all the time, and did not direct the running of any train, and do not know how they were run when I was not on duty. I do not know whether or not any freight-train run on Sunday was run by the special order and sanction of Maj. McCollum, the superintendent.

A conductor of a passenger-train at the time of the wreck mentioned, testified: Our schedule time to leave Atlanta was seven fifty, but on account of the wreck we did not leave till eight fifty. When we got up to the place of the wreck, about fifteen miles from Atlanta, the road was clear. The regular time for the freight to leave Atlanta was seven fifty-five, soon after we left and following our train out. I know the fact, because I saw it posted on the bulletin-board at Atlanta, that freight conductors were forbidden to violate Sunday laws, and the freight-trains leaving Chattanooga Sunday night were forbidden to come into Georgia before midnight. I am agent of the defendant at this place now. I do not know what special order Maj. McCollum may have given as to the running of any special train or trains.

R. J. & J. McCAMY, for plaintiff in error.

A. W. FITE, solicitor-general, contra.